WILLIAM GREANEY, Appellant and Cross-Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Michel Masonry Company, Appellee and Cross-Appellant).

First District (Illinois Workers' Compensation Commission Division)
No. 1—04—2796WC

Opinion filed June 29, 2005.

Corti, Freeman & Aleksy, of Chicago (Richard Aleksy, of counsel), for appellant.

Garofalo, Schreiber, Hart & Storm, of Chicago (Kevin J. Reid, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The claimant, William Greaney, appeals and Michel Masonry Co. (Michel) cross-appeals from various orders of the circuit court of Cook County entered on judicial review of decisions of the Industrial Com-

mission (Commission)[1] awarding the claimant certain benefits in connection with his application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)). For the reasons that follow, we affirm in part, reverse in part, vacate in part, and remand this matter to the Commission with instructions.

On September 11, 1998, the claimant filed an application for adjustment of claim alleging that he had suffered an accidental injury while working for Michel on June 15, 1998. An arbitration hearing was held on May 8, 2001, during which the following facts were established by the testimony and exhibits presented.

The claimant testified that, prior to his injury, he had been employed by Michel as a laborer for approximately five months. The claimant stated that, on June 15, 1998, he was carrying two buckets containing approximately 100 pounds of mortar down a flight a stairs when his right hip "gave way," causing his back to rotate. He testified that he immediately notified the foreman about his injury and that he went to the emergency room at Palos Community Hospital (Palos) that same day. The records from Palos state that the claimant presented with complaints of a "low back injury" and that he underwent a CT scan which showed asymmetric bulging of his intervertebral disc at L5-S1 and bulging annulus with no focal herniation at L4-5 and L3-4.

On June 19, 1998, the claimant visited Dr. Paul Atkenson, an orthopaedic surgeon. The claimant testified that he treated with Dr. Atkenson for several weeks and that the doctor referred him to the Orland Therapy Specialists (Orland) for physical therapy. In a letter from Orland to Dr. Atkenson dated June 24, 1998, a therapist stated that the claimant was suffering from low back pain and right leg pain following a work injury on June 15, 1998. The therapist further noted that the claimant's right hip flexion strength measured four on a scale of five.

The claimant testified that he was eventually referred by Michel's insurance carrier to Dr. Muhammad Alvi. Dr. Alvi's records, which were admitted into evidence over Michel's hearsay, foundation, and authenticity objections, show that the claimant's first examination was on July 11, 1998. In a report addressing that examination, Dr. Alvi stated that the claimant was presenting with constant severe mid-line lower-back symptoms and moderate to severe bilateral myo-

---

[1]Effective January 1, 2005, the name of the Industrial Commission was changed to the "Illinois Workers' Compensation Commission." However, because the Industrial Commission was named as such when the instant cause was originally filed, we will use the name for purposes of consistency.

spasms in his legs. Dr. Alvi diagnosed the claimant as suffering from lumbar neuritis/radicolitis with associated myospasms, and began a treatment program which consisted of manipulation, passive stretching, and the application of paravertebral nerve blocks.

The claimant stated that he was subsequently referred by Dr. Alvi to Dr. William A. Earman. In a post-examination report dated September 21, 1998, Dr. Earman opined that the claimant was suffering from a lumbar spine strain, and he recommended a course of physical therapy and lumbar support. In a letter to Michel's insurance carrier dated October 23, 1998, Dr. Earman reported that the claimant had completed his course of physical therapy and that, in his opinion, the claimant was not in need of additional treatment. Accordingly, Dr. Earman released the claimant to return to full duty work and discharged him from his care. In a faxed response to an inquiry from Michel's insurance carrier dated October 28, 1998, Dr. Earman stated that the claimant would reach maximum medical improvement (MMI) on October 30, 1998.

On October 26, 1998, Dr. Alvi similarly released the claimant to return to work with the only restriction being that he wear a belt during "lifting operations." The claimant testified that he returned to Michel for two days before he stopped working again on October 27, 1998. Following an examination on December 14, 1998, Dr. Alvi found the claimant to be totally incapacitated and took him off work.

The claimant was also referred by Dr. Alvi to Dr. Mark A. Lorenz, whose records were admitted into evidence at the arbitration hearing over Michel's hearsay and authentication objections. These records show that the claimant first visited Dr. Lorenz on January 14, 1999, at which time he was diagnosed with diskogenic back pain without a true herniation and prescribed a regimen of physical therapy with Dr. Bob L. Hung.

The claimant first visited Dr. Hung on January 14, 1999. In a report following that examination, Dr. Hung found the claimant to be suffering from myofascial pain, mechanical low back pain, and a "deconditioned back." Following an examination on February 18, 1999, Dr. Hung also found the claimant to be suffering from right hip bursitis, and recommended that he undergo a functional capacity examination (FCE) following the completion of his physical therapy program.

The record shows that the claimant completed a FCE on March 31, 1999, the results of which indicated that he was incapable of performing the duties of a laborer. A report detailing the result of this FCE was contained within the documents submitted by Dr. Alvi and was also admitted into evidence as a separate exhibit from LaGrange

Memorial Hospital Work Rehabilitation Center (LaGrange). Also contained in the LaGrange exhibit was a letter from Meg Wilton, a registered nurse hired by Michel's insurance carrier to manage the claimant's case, which contained a description of the physical demands of the claimant's job. The LaGrange exhibit was admitted into evidence over Michel's hearsay, foundation, and authenticity objections.

In a post-examination report dated April 15, 1999, Dr. Hung stated that the claimant's lower-back pain had resolved "quite nicely," but that his right hip pain had worsened to the point where he had difficulty ambulating. Dr. Hung also stated that, despite his right hip pain, the claimant "did quite well" on the FCE. In a post-examination report dated May 25, 1999, Dr. Hung noted that the claimant stated he had been suffering from right hip pain "ever since the accident itself." In a subsequent post-examination report, Dr. Hung stated that the claimant's right hip pain was the main limiting factor in terms of his return to work on a full duty basis and that, unless his hip pain lessened, he would most likely not be able to return to his previous work level. The claimant completed a second FCE on August 25, 1999, the results of which showed that the claimant's capabilities fell within the "medium-heavy" physical demand level, while his position as a laborer fell within the "heavy to very heavy" physical demand level. The report from the claimant's second FCE was contained in the documents submitted by Dr. Lorenz.

The claimant testified that he was released to return to work on November 4, 1999, "within the restrictions imposed by the [FCE]." The claimant stated that, following his release, he contacted Michel in order to inquire about a job and that Michel did not offer him a position within his restrictions. The claimant then initiated an independent job search and eventually accepted a position as an X-ray technician with National Testing Service (NTS) on December 25, 1999. The claimant stated that NTS paid him $10.75 an hour and that his job required him to travel extensively, climb in and out of ditches, and sit around "for hours upon hours." According to the claimant, he left his job at NTS because it was causing him back pain. He subsequently took a job with Inlander Brothers (Inlander) as a forklift driver where he earned $8 an hour. The claimant stated that his job at Inlander allowed him to walk around and stretch every 20 minutes and that he was not required to do any heavy lifting.

At Michel's request, the claimant was examined several times by Dr. Boone Brackett. Over Michel's hearsay, foundation, and authenticity objections, the claimant introduced a post-examination report from Dr. Brackett dated March 6, 2001. In this report, Dr. Brackett stated that the claimant returned to work in November 1999 with a "sixty-

five pound weight restriction," and opined that the claimant was doing "reasonably well" working within this restriction.

Admitted into evidence were two exhibits containing certain information relating to the claimant's employment. The first form contained detailed information from the claimant's employment at Michel. It listed the number of hours and days the claimant worked during each of the 17 weekly pay periods he was employed by Michel prior to his injury. This exhibit showed that the claimant worked 420.5 hours and earned $9,451.18 during that period. Although the claimant testified that his workweek consisted of five eight-hour days, the exhibit reflects that he only worked 59 days during the 17 weekly pay periods preceding his injury. The form listed the claimant's hourly wage at $22.35 during the first 15 weekly pay periods, and as $23.35 per hour during the final two weekly pay periods. A second form listed the same details for the claimant's employment during the period between December 25, 1999, and February 17, 2001. The claimant testified that, at the time of the arbitration hearing, laborers earned $25.41 an hour. The arbitrator, however, rejected an exhibit entitled "new scale of wages for construction and general laborers effective 6-1-00 to 5-31-01" which supported the claimant's testimony on this issue.

Following the hearing, the arbitrator found that the claimant sustained an accidental injury on June 15, 1998, arising out of and in the course of his employment with Michel and that a causal relationship exists between the claimant's lower-back condition and his work-related accident. However, the arbitrator found no causal connection between the claimant's right hip bursitis and his work-related accident. The arbitrator also found that the claimant's average weekly wage was $899.04, and that Michel had paid $50,157.36 to the claimant on account of his injury. The arbitrator awarded the claimant: temporary total disability (TTD) benefits for $65^3/_7$ weeks, representing the periods of June 16, 1998, through October 23, 1998, and December 14, 1998, through November 4, 1999; maintenance benefits for $3^2/_7$ weeks, representing the period between November 5, 1999, and November 29, 1999; wage differential benefits in the amount of $312.69 per week, commencing on December 25, 1999, for the duration of his disability; $7,239.41 in penalties, as provided for in section 19(k) of the Act (820 ILCS 305/19(k) (West 2002)); $1,447.88 in attorney fees pursuant to section 16 of the Act (820 ILCS 305/16 (West 2002)); and $163.61 for the claimant's necessary medical expenses.

Both parties sought a review of the arbitrator's decision before the Commission. On April 9, 2002, the Commission, in a decision written by Commissioner Robert Madigan, with two Commissioners concur-

ring in part and dissenting in part, modified the arbitrator's decision to find that a causal connection exists between the claimant's right hip bursitis and his work-related accident, and affirmed and adopted the remainder of the arbitrator's decision. Commissioner Richard Gilgis dissented in part on the basis that the arbitrator incorrectly awarded the claimant maintenance benefits for the period from November 5, 1999, the date on which he reached MMI, through November 29, 1999. Commissioner Jacqueline A. Kinnaman dissented in part on the basis that the arbitrator improperly calculated the claimant's wage differential award. The Commission also found that Michel waived any argument concerning the award of section 19(k) penalties and section 16 attorney fees, and that both parties waived consideration of the arbitrator's award of medical expenses by failing to raise those issues in both of their respective petitions for review and statements of exception.

Thereafter, the parties sought judicial review of the Commission's decision in the circuit court of Cook County. On November 20, 2002, the circuit court confirmed the Commission's decision with respect to causal connection and the claimant's entitlement to: TTD benefits from June 16, 1998, through October 23, 1998, and from December 14, 1998, through November 4, 1999; wage differential benefits; section 19(k) penalties; section 16 attorney fees; and medical expenses. The court, however, reversed the Commission's calculations of the claimant's average weekly wage and wage differential benefits. The court also found that the claimant was entitled to permanent partial disability (PPD) benefits, not TTD or maintenance benefits, from November 4, 1999, until November 29, 1999, and that the Commission erred in failing to award the claimant section 19(l) penalties (820 ILCS 305/19(l) (West 2002)). Accordingly, the circuit court remanded the matter to the Commission with instructions that it enter an award of $2,500 in penalties pursuant to section 19(l) of the Act, recalculate the claimant's average weekly wage in accordance with *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 230, 756 N.E.2d 822 (2001), and, based thereon, recalculate the amount of TTD benefit payments, wage differential payments, section 19(k) penalties, and section 16 attorney fees. The claimant filed a motion to reconsider, which the circuit court denied on March 21, 2003. He also filed a motion for clarification of the court's orders of November 20, 2002, and March 21, 2003. The court subsequently issued a clarification order, stating, *inter alia*, that the matter was being remanded to the Commission with instructions that it consider whether the claimant was entitled to wage differential benefits for the period from "November 5, 1999, through December 24, 1999, or any portion thereof."

Michel appealed to this court and, on June 10, 2003, we entered an order dismissing the appeal for lack of jurisdiction because the matter had been remanded to the Commission, rendering the circuit court's order interlocutory in nature. See *A.O. Smith Corp. v. Industrial Comm'n*, 109 Ill. 2d 52, 54, 485 N.E.2d 335 (1985). On remand from the circuit court, the Commission entered a decision on December 8, 2003, which fixed the claimant's average weekly wage at $570.70. Based on this calculation, the Commission then awarded the claimant: TTD benefits for 65³/₇ weeks, representing the periods of June 16, 1998, through October 23, 1998, and December 14, 1998, through November 4, 1999; wage differential benefits in the amount of $167.13 per week, commencing on November 5, 1999, for the duration of his disability; $2,500 in section 19(l) penalties; and no section 19(k) penalties or section 16 attorney fees due to Michel's overpayment of benefits. The circuit court confirmed the Commission's December 8, 2003, decision. Thereafter, the claimant filed a timely notice of appeal, and Michel filed its cross-appeal.

Michel first contends that the Commission erred in allowing into evidence and considering the records and reports of Drs. Brackett, Alvi, and Lorenz, and the documents contained in the LaGrange exhibit. We agree.

The rules of evidence apply to all proceedings before the Commission or an arbitrator, except to the extent they conflict with the Act. 50 Ill. Adm. Code § 7030.70(a) (2002); *Paganelis v. Industrial Comm'n*, 132 Ill. 2d 468, 479, 548 N.E.2d 1033 (1989). Evidentiary rulings made during the course of a workers' compensation proceeding will be upheld on review absent an abuse of discretion. *National Wrecking Co. v. Industrial Comm'n*, 352 Ill. App. 3d 561, 566, 816 N.E.2d 722 (2004).

■ Michel argues that the report of Dr. Brackett was hearsay and should not have been admitted into evidence. Before addressing this argument, we note that while Michel objected to the admission of Dr. Brackett's report at the arbitration hearing on the grounds of hearsay, lack of foundation, and authenticity, it only challenges the admission of Dr. Brackett's report before this court on hearsay grounds.

Relying on *Nollau Nurseries, Inc. v. Industrial Comm'n*, 32 Ill. 2d 190, 204 N.E.2d 745 (1965), the arbitrator, over Michel's objections, admitted Dr. Brackett's report into evidence as an admission against Michel's interest. Citing *Taylor v. Kohli*, 162 Ill. 2d 91, 96, 642 N.E.2d 467 (1994), Michel argues that Dr. Brackett was not its agent and, therefore, the arbitrator and the Commission erred in admitting the report for the basis stated. In *Taylor*, our supreme court held that, as a matter of law, an expert witness is not *per se* an agent of the party who hired him or her and, therefore, the expert's statements and

opinions are not admissible as admissions against that party's interest. *Taylor*, 162 Ill. 2d at 96. We have since applied the holding in *Taylor* to the reports of examining physicians in workers' compensation actions. *Kraft General Foods v. Industrial Comm'n*, 287 Ill. App. 3d 526, 531-32, 678 N.E.2d 1250 (1997). Accordingly, we find that Dr. Brackett was not Michel's agent and, therefore, his report does not constitute an admission against Michel's interest. Moreover, because Dr. Brackett was hired by Michel to perform an independent medical examination of the claimant, rather than to assist in the treatment of his injury, his report is not admissible under the exception to the hearsay rule we announced in *Fencl-Tufo Chevrolet, Inc. v. Industrial Comm'n*, 169 Ill. App. 3d 510, 514-15, 523 N.E.2d 926 (1988). The claimant does not advance, and we cannot find, any other exception to the hearsay rule under which the doctor's report could be admitted. We conclude, therefore, that the Commission abused its discretion in admitting and considering Dr. Brackett's report over Michel's hearsay objection.

■ Michel next argues that the Commission erred in admitting the uncertified reports of Drs. Alvi and Lorenz into evidence. Although Michel concedes that, pursuant to this court's holding in *Fencl-Tufo Chevrolet, Inc.*, the reports of these treating physicians are not hearsay because they were prepared in the course of the claimant's medical treatment, it argues that the claimant failed to lay a proper foundation to establish their authenticity. Citing *Nollau Nurseries, Inc.*, the claimant asserts that both of the doctors' reports were admissible as admissions against Michel's interest. Moreover, despite the fact that Dr. Alvi's reports were not certified, the claimant argues that they were "better than certified" because they were original documents which had been delivered to his counsel pursuant to a subpoena.

Even when a document falls within a recognized exception to the hearsay rule, an adequate foundation must still be laid before it is admitted into evidence. *National Wrecking Co.*, 352 Ill. App. 3d at 568. In order to lay an adequate foundation, the proponent must present evidence to demonstrate that the document is what it claims to be. *National Wrecking Co.*, 352 Ill. App. 3d at 568; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 901.1, at 905-06 (7th ed. 1999). Absent proper authentication and identification, the document cannot be admitted into evidence. *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 42, 731 N.E.2d 371 (2000).

Here, we find that the claimant failed to lay a foundation for the admission into evidence of the uncertified reports of Drs. Alvi and Lorenz. First, we find no merit in the claimant's argument that the doctors' reports are admissible as admissions against Michel's inter-

est. Furthermore, the question of whether these reports fall within an exception to the hearsay rule is not at issue. Rather, the issue here is whether the claimant laid an adequate foundation for their admission into evidence over Michel's objections. To this end, the claimant simply argues that Dr. Alvi's reports were admissible because they were submitted pursuant to a subpoena issued by the arbitrator. The claimant, however, has not cited, and our research has not revealed, a case in which the authenticity of a document was established solely through evidence of compliance with a subpoena. Moreover, we note that, while the record contains a copy of a subpoena commanding Dr. Alvi to produce various documents to the claimant's counsel, there is no certification in the record by Dr. Alvi that whatever documents he submitted were true, accurate, and complete copies of the documents in his control pertaining to the claimant's care and treatment. Thus, we find no merit in the claimant's assertion that Dr. Alvi's compliance with a subpoena established the authenticity or identity of his reports. As the claimant failed to present any further evidence demonstrating the authenticity of the records and reports of either doctor, we find that he failed to lay an adequate foundation for their admission into evidence. As a consequence, the Commission abused its discretion in admitting and considering the medical records and reports of Drs. Alvi and Lorenz.

We similarly find that the Commission abused its discretion in admitting and considering the documents contained in the LaGrange exhibit. The record shows that this exhibit consisted of a copy of the report issued by LaGrange following the claimant's FCE on March 31, 1999, and a letter from Wilton to an unidentified individual. The arbitrator admitted these documents into evidence as admissions against Michel's interest over Michel's hearsay, foundation, and authenticity objections. The Commission and circuit court affirmed this ruling. On appeal, Michel argues that, regardless of whether these documents fall within an exception to the hearsay rule, the claimant failed to lay a proper foundation for their admission into evidence. Again, we agree.

Once again we stress that, regardless of whether the LaGrange report and Wilton letter are admissible under an exception to the hearsay rule, the claimant was still required to demonstrate their authenticity and lay a proper foundation for their admission into evidence. *National Wrecking Co.*, 352 Ill. App. 3d at 568. Here, however, just as with the medical records and reports of Drs. Alvi and Lorenz, the claimant failed to present any evidence demonstrating the authenticity of the documents in the LaGrange exhibit or otherwise lay a foundation for their admission into evidence. The claimant did

not even take advantage of the simple certification procedure set forth in section 16 of the Act (820 ILCS 305/16 (West 2002)). Consequently, we find that the Commission abused its discretion in admitting the LaGrange exhibit into evidence.

A question remains, however, concerning the effect of our finding that these reports and records were improperly admitted into evidence and considered by the Commission in rendering its decision. Although the Commission referred to these exhibits in reaching its determinations as to causation, the nature and extent of injury, and the claimant's entitlement to a wage differential award, it also referred to the claimant's testimony and the properly admitted reports and records of Drs. Atkenson and Hung, Palos, and Orland. Not every admission of incompetent evidence warrants a reversal and remand for a new hearing. When erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless. *Gust K. Newberg Construction v. Industrial Comm'n*, 230 Ill. App. 3d 96, 114, 594 N.E.2d 758 (1992). Our reading of the record as a whole leads us to conclude that the Commission's findings as to causation, the nature and extent of injury, and the claimant's entitlement to a wage differential award are sufficiently supported by other competent evidence so as to render its erroneous admission of the reports and records of Drs. Brackett, Alvi, and Lorenz and the documents contained in the LaGrange exhibit harmless. Accordingly, we shall address the parties' remaining assignments of error, ignoring the erroneously admitted records and reports.

■ Michel next contends that the Commission's determination that the claimant's right hip bursitis is causally connected to his work-related accident is against the manifest weight of the evidence. We disagree.

To be compensable under the Act, a claimant's injury must arise out of and in the course of his or her employment. 820 ILCS 305/2 (West 2002). Every natural consequence that flows from an injury arising out of and in the course of a claimant's employment is compensable unless such injury is caused by an independent intervening act which breaks the causal connection between the employment and the claimant's condition of ill-being. *Teska v. Industrial Comm'n*, 266 Ill. App. 3d 740, 742, 640 N.E.2d 1 (1994). The extent of injury suffered as a result of a work-related accident is a question of fact for the Commission to resolve, and its decision in the matter will not be overturned on review unless it is contrary to the manifest weight of the evidence. *Oscar Mayer & Co. v. Industrial Comm'n*, 79 Ill. 2d 254, 256, 402 N.E.2d 607 (1980).

In this case, the claimant testified that he had not suffered any

injuries to his right hip before it "gave way" at the time of his work injury. The record also shows that the claimant began to complain of pain extending from his lower back through his right buttock and leg immediately after his work injury, and decreased strength in his right hip was noted in the letter from Orland on June 24, 1998. On February 18, 1999, Dr. Hung diagnosed the claimant as suffering from right hip bursitis, and he noted in a post-examination report dated May 25, 1999, that the claimant stated he had been suffering from right hip pain "ever since the accident itself." Based on this evidence, and the lack of any evidence of an independent intervening act or non-work-related cause, we cannot say that the Commission's determination that the claimant's right hip bursitis is causally connected to his work-related injury is against the manifest weight of the evidence.

Michel next contends that the Commission's finding that the claimant's present condition of ill-being is causally connected to his work-related accident, and its award of TTD benefits after the claimant's lower-back condition allegedly resolved on February 23, 1999, are against the manifest weight of the evidence. Both of these contentions are premised on the argument that, after February 23, 1999, the claimant's condition of ill-being was solely related to his right hip bursitis and that his right hip bursitis is not causally connected to his work-related accident. As discussed above, however, the Commission's determination that the claimant's right hip bursitis is causally connected to his work-related injury is not against the manifest weight of the evidence. Thus, having rejected the premise, we also reject both of Michel's arguments in this regard.

■ Finally, Michel contends that the Commission's award of wage differential benefits under section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 2002)) is against the manifest weight of the evidence. Michel argues that the claimant failed to demonstrate that his injuries prevented him from pursuing his "usual and customary line of employment."

In order to qualify for a wage differential award under section 8(d)(1), a claimant must prove: (1) a partial incapacity which prevents him from pursuing his "usual and customary line of employment," and (2) an impairment of his earnings. 820 ILCS 305/8(d)(1) (West 2002); *Yellow Freight Systems v. Industrial Comm'n*, 351 Ill. App. 3d 789, 794, 814 N.E.2d 910 (2004). Here, Michel only challenges the first element.

The parties agree that the claimant reached MMI no later than November 4, 1999, and was released to return to work on that date within the restrictions imposed by his FCE. The claimant testified that he contacted Michel after his release and was not offered a posi-

tion within his restrictions. Prior to his release to return to work, Dr. Hung stated that the claimant's right hip pain was the main limiting factor in terms of his return to work on a full-duty basis, and that unless his hip pain lessened, he would most likely not be able to return to his previous work level. There was no evidence presented showing that the claimant's right hip pain lessened to the point where he was able to resume his duties as a laborer. Furthermore, the claimant testified that, as of the date of the arbitration hearing, no doctor had released him to return to "full duty work." He also stated that he continues to experience hip and back pain while sitting or walking for extended periods of time. Based on this evidence, we cannot say that the Commission's determination that the claimant was unable to pursue his "usual and customary line of employment" is against the manifest weight of the evidence.

■ The claimant contends on appeal that the Commission's calculation of his average weekly wage is against the manifest weight of the evidence. He argues that the Commission's original calculation of $899.04 was correct, and should be reinstated in place of the Commission's December 8, 2003, calculation of $570.70 which was confirmed by the circuit court.

Pursuant to section 10 of the Act (820 ILCS 305/10 (West 2002)), a claimant's average weekly wage may be calculated according to one of four methods. The first two methods each require a claimant to be employed for a period of 52 weeks prior to the date of injury and are clearly not applicable in this case. See 820 ILCS 305/10 (West 2002); *Sylvester*, 197 Ill. 2d at 230. Under the third method, "[w]here the employment prior to the injury extended over a period of less than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee actually earned wages shall be followed." 820 ILCS 305/10 (West 2002). The fourth and final method provides that, "[w]here by reason of the shortness of the time during which [his] employee has been in the employment of his employer or of the casual nature or terms of the employment, it is impractical to compute the average weekly wages as [otherwise defined in section 10 of the Act], regard shall be had to the average weekly amount which during the 52 weeks previous to the injury, illness or disablement was being or would have been earned by a person in the same grade employed at the same work for each of such 52 weeks for the same number of hours per week by the same employer." 820 ILCS 305/10 (West 2002). A claimant bears the burden of establishing his average weekly wage under section 10 of the Act. *Ricketts v. Industrial Comm'n*, 251 Ill. App. 3d 809, 810, 623 N.E.2d 847 (1993).

Ordinarily, the determination of a claimant's average weekly wage is a question of fact for the Commission to resolve, and its finding will not be disturbed on review unless it is found to be against the manifest weight of the evidence. *Sylvester*, 197 Ill. 2d at 231-32. However, when as in this case, the facts are undisputed and the issue is purely one of statutory construction, our review is *de novo*. See *Joiner v. Industrial Comm'n*, 337 Ill. App. 3d 812, 815, 786 N.E.2d 627 (2003).

Here, the record establishes that the claimant was employed by Michel for less than 52 weeks prior to his injury on June 15, 1998, and neither party claims that he was employed for such a short time prior to his injury that the fourth method provided in section 10 for computing an average weekly wage should have been used by the Commission. The third method for calculating an average weekly wage set forth in section 10 is clearly applicable in this case.

The exhibits received in evidence show that, during the 17 weekly pay periods that the claimant was employed by Michel prior to his injury, he worked 420.5 hours in 59 days and was paid a total of $9,451.18. The exhibits also show that the claimant only worked five days in six of the pay periods. He worked less than 5 days in 10 pay periods and did not work at all in one of the pay periods. Although the claimant testified that he was a full-time employee scheduled to work five days per week, he admitted that the number of hours that he would work depended on the weather.

Under the third method of calculating an average weekly wage set forth in section 10, the claimant's earnings of $9,451.18 must be divided by the "number of weeks and parts thereof" during which he actually earned wages prior to his injury. The parties disagree, however, on the meaning of the phrase "number of weeks and parts thereof."

The arbitrator determined that the claimant had worked 10.5125 weeks prior to his injury by dividing the total number of hours worked by the claimant (420.5) by 40 (the number of hours in a full workweek). She then divided $9,451.18, the claimant's gross earnings, by 10.5125 weeks to arrive at an average weekly wage of $899.04. In its original decision of April 9, 2002, the Commission adopted the arbitrator's calculation. The circuit court, in its order of November 20, 2002, found the calculation to be erroneous and remanded the matter to the Commission to, *inter alia*, recalculate the claimant's average weekly wage consistent with the holding in *Sylvester*. In its decision of December 8, 2003, on remand, the Commission fixed the claimant's average weekly wage at $570.70 by dividing his total wages of $9,451.18 by 16, the number of weeks prior to his injury in which the claimant actually earned wages. The Commission stated, however,

that it would not have calculated the claimant's average weekly wage in this manner "but for the specific instructions from the Cook County Circuit Court." When the matter was again before the circuit court on judicial review, the court confirmed the Commission's decision of December 8, 2003.

The claimant argues that the Commission's original computation of his average weekly wage was correct and should be reinstated. Michel argues that the calculation in the Commission's December 8, 2003, decision is not against the manifest weight of the evidence, although conceding that the Commission made a mathematical error as $9,451.18 divided by 16 is $590.70, not $570.70. For the reasons that follow, we believe that both parties are in error in their application of the third method of calculating the average weekly wage under section 10 of the Act.

In *Sylvester v. Industrial Comm'n*, 314 Ill. App. 3d 1100, 732 N.E.2d 751 (2000), *aff'd*, 197 Ill. 2d 225, 756 N.E.2d 822 (2001), this court, in applying the second method of calculating the average weekly wage pursuant to section 10 of the Act, rejected a computation that simply divided the gross wages earned by the claimant prior to his injury by the number of calender weeks in which he earned the wages, the very formula that was used by the Commission in its decision of December 8, 2003. Such a method of computation strains the meaning of the phrase "number of weeks and parts thereof" (820 ILCS 305/10 (West 2002)) as it "effectively equates all calendar weeks during which the [claimant] did any work, regardless of how many days he worked during the week." *Peoria Roofing & Sheet Metal Co. v. Industrial Comm'n*, 181 Ill. App. 3d 616, 620, 537 N.E.2d 381 (1989). In *Peoria Roofing*, we held that "one day is, in fact, only a fraction of a work week." *Peoria Roofing*, 181 Ill. App. 3d at 620.

In *D.J. Masonry Co. v. Industrial Comm'n*, 295 Ill. App. 3d 924, 693 N.E.2d 1201 (1998), we affirmed the Commission's computation of the average weekly wage arrived at by fixing the number of weeks and parts thereof worked by the claimant by dividing the number of days he actually worked by the number of days in a full workweek. Although in *D.J. Masonry* we were addressing an application of the second method for computing an average weekly wage under section 10 (see *D.J. Masonry*, 295 Ill. App. 3d at 932), we believe that the method employed to calculate the number of weeks and parts thereof worked by the claimant in that case is also applicable to a similar calculation under the third method.

In both the second and third methods of calculating a claimant's average weekly wage set forth in section 10 of the Act, a determination must be made as to the "number of weeks and parts thereof"

that the claimant worked during the relevant time period. We find nothing in the wording of the statute that would support a conclusion that the legislature intended the phrase at issue to have a different meaning in the third method of calculation then it has in the second. Additionally, the claim of windfall that was made by the employer and rejected by this court in *D.J. Masonry* is no more compelling in the context of a calculation under the third method. See *D.J. Masonry*, 295 Ill. App. 3d at 933-34; see also *Sylvester*, 197 Ill. 2d at 235-36.

We also reject the claimant's argument that the Commission's original calculation of his average weekly wage in its decision of April 9, 2002, was correct. As noted earlier, in her decision which the Commission adopted, the arbitrator divided the total number of hours that the claimant worked prior to his injury by the number of hours in a full workweek to arrive at the conclusion that he had worked 10.5125 weeks. She then divided the claimant's gross earnings of $9,451.18 by 10.5125 weeks to arrive at an average weekly wage of $899.04.

As our supreme court observed in *Sylvester*, only the fourth method under section 10 for calculating an average weekly wage refers to hours worked per week. *Sylvester*, 197 Ill. 2d at 237. The claimant has not cited any authority for calculating an average weekly wage under the third method by dividing the total numbers of hours worked prior to an injury by the number of hours in a full workweek to arrive at the number of weeks and parts thereof worked and then dividing the claimant's gross wages by that number. In *Ricketts*, this court held that there would be no need for alternative methods of calculating an average weekly wage if the legislature intended the number of hours worked to be multiplied out to complete a 40-hour-week even if the employee never worked a 40-hour week. *Ricketts*, 251 Ill. App. 3d at 812.

When, as in this case, a claimant is a full-time employee, scheduled to work a full workweek, and his average weekly wage is to be determined by applying the third method set forth in section 10, the number of days that a claimant worked prior to his injury should be divided by the number of days in a full workweek to arrive at the "number of weeks and parts thereof" by which the claimant's pre-injury wages are to be divided. In this case, the claimant worked 59 days in the 17 weekly pay periods prior to his injury. He testified that he was a full-time employee, scheduled to work five days a week. Dividing the 59 days that he worked by 5, the number of days in a full workweek, we conclude that the claimant worked 11.8 weeks prior to his injury. When the claimant's gross wages of $9,451.18 are divided by 11.8, the "number of weeks and parts thereof" that he worked prior to his injury, his average weekly wage is fixed at $800.95 under the third method of calculation set forth in section 10 of the Act.

Based upon the foregoing analysis, we find that both of the Commission's calculations of the claimant's average weekly wage were erroneous. Accordingly, we reverse that portion of the circuit court's order confirming the Commission's December 8, 2003, calculation of the claimant's average weekly wage and the corresponding calculation of the weekly TTD benefits to which the claimant is entitled. We remand this cause to the Commission with directions to fix the claimant's average weekly wage at $800.95 and, based thereon, to recalculate the amount of TTD benefits to which the claimant is entitled.

■ The claimant next contends that the circuit court erred in reversing the Commission's original award of maintenance benefits. Citing *Roper Contracting v. Industrial Comm'n*, 349 Ill. App. 3d 500, 812 N.E.2d 65 (2004), the claimant argues that the circuit court in its order of November 20, 2002, erroneously held that he was not entitled to maintenance benefits because he did not request vocational rehabilitation and was not in a "prescribed rehabilitation program."

In this case, the claimant submitted a request for hearing form to the arbitrator which alleged that he was temporarily totally disabled from June 16, 1998, through October 24, 1998, and from October 27, 1998, through November 29, 1999. Following the hearing, the arbitrator found that the claimant reached MMI on November 4, 1999, and that he was entitled to maintenance benefits from that point until November 29, 1999. The Commission affirmed and adopted this determination. However, the circuit court, in its orders of November 20, 2002, and March 21, 2003, found that the claimant was not entitled to maintenance benefits because he did not request vocational rehabilitation and because he was not in a "prescribed rehabilitation program." Rather, the court held that if the claimant was entitled to any benefits after November 4, 1999, those benefits would have to be in the form of a wage differential.

Contrary to the circuit court's reasoning, in *Roper Contracting*, we held that a claimant is not required to request vocational rehabilitation before being entitled to an award of maintenance, and there is no rule prohibiting claimant-created and directed vocational rehabilitation programs. *Roper Contracting*, 349 Ill. App. 3d at 505-06. A claimant is generally entitled to vocational rehabilitation when he sustains a work-related injury which causes a reduction in his earning power and there is evidence that rehabilitation will increase his earning capacity. *National Tea Co. v. Industrial Comm'n*, 97 Ill. 2d 424, 432, 454 N.E.2d 672 (1983). The evidence in this case shows that the claimant suffered a work-related injury and that the restrictions arising from that injury impaired his earning power. Further, the record

establishes that the claimant's self-created vocational program increased his earning capacity as demonstrated by the positive results of his job search. Therefore, in its original decision, the Commission properly awarded the claimant maintenance benefits for the period of time he was undertaking his self-created and directed rehabilitation program, and the circuit court erred in finding that the claimant was not entitled to such an award. See *Roper Contracting*, 349 Ill. App. 3d at 505. However, our decision in this regard does not end our analysis of the issue of claimant's entitlement to maintenance benefits.

In its original decision, the Commission affirmed and adopted the arbitrator's award of maintenance benefits to the claimant for the period from November 5, 1999, through November 29, 1999. The claimant argues that he is entitled to maintenance benefits for the entire period from November 5, 1999, through December 25, 1999, when he began working for NTS. However, as the circuit court correctly observed in its order of March 21, 2003, the claimant never raised any issue relating to the proper date for ending his entitlement to maintenance in the petition for review or statement of exceptions he filed with the Commission. The failure to raise an issue before the arbitrator and the Commission results in its waiver. *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 336, 399 N.E.2d 1322 (1980). Therefore, the claimant has forfeited any argument concerning his entitlement to maintenance benefits after November 29, 1999.

For the reasons set forth above, we reverse that portion of the circuit court's order of August 12, 2004, confirming the Commission's award of wage differential benefits from November 5, 1999, through December 24, 1999, and reinstate the Commission's April 9, 2002, award of maintenance benefits for the period from November 5, 1999, through November 29, 1999. Further, upon remand, we instruct the Commission to recalculate the claimant's maintenance benefits based on an average weekly wage of $800.95.

■ The claimant next contends that the Commission's calculation of his wage differential award is both contrary to the law and against the manifest weight of the evidence. The claimant argues that the Commission improperly equated his average weekly wage with the amount that he would have been able to earn in the full performance of his duties as a laborer at the time of the arbitration hearing. We agree.

Under section 8(d)(1) of the Act, a qualifying claimant is entitled to receive compensation for the duration of his disability equal to 66²/₃% of the difference between "the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of [his] accident and the average

amount which he is earning or is able to earn in some suitable employment or business after the accident." 820 ILCS 305/8(d)(1) (West 2002). The award should be calculated based on the amount the claimant would have been able to earn at the time of the arbitration hearing if he were able to fully perform the duties of the occupation in which he was engaged at the time of his injury. *Old Ben Coal Co. v. Industrial Comm'n*, 198 Ill. App. 3d 485, 493, 555 N.E.2d 1201 (1990).

In this case, the arbitrator awarded the claimant a wage differential in the amount of $312.69 per week. After fixing the claimant's average weekly wage at $899.04, the arbitrator found that it was also the amount that he would have been able to earn in the full performance of his occupation as a laborer. Next, the arbitrator held that, after his injury, the claimant was able to earn $430 per week in some suitable employment, computing that sum by multiplying $10.75 per hour, the amount the claimant was paid as an X-ray technician by NTS, by 40, the number of hours in a full workweek. The arbitrator then subtracted $430 from $899.04 and took 66²/₃% of the remainder to arrive at a weekly wage differential of $312.69. In its original decision of April 9, 2002, the Commission affirmed and adopted the arbitrator's calculation in this regard. However, in its order of November 20, 2002, the circuit court reversed the calculation and remanded the matter back to the Commission with directions to recalculate the wage differential award after subtracting $320, the amount that the claimant was paid by Inlander for a 40-hour workweek, from the claimant's recalculated average weekly wage. As noted earlier, the Commission on remand recalculated the claimant's average weekly wage at $570 and, after subtracting $320 from that amount and taking 66²/₃% of the remainder, fixed the wage differential to which the claimant is entitled at $167.13. The circuit court confirmed the Commission's recalculated award in its order of August 12, 2004.

The claimant argues that both of the Commission's calculations were in error and that he is entitled to a wage differential award using the sum of $1,016.40 as the amount he would have been able to earn in the full performance of his duties as laborer on the date of the arbitration hearing. He arrives at this amount by multiplying $25.41, the amount that he testified a laborer was paid per hour on the date of the arbitration hearing, by 40, the number of hours in a full workweek. Michel contends the claimant's testimony that a laborer earned $25.41 per hour on the date of the arbitration hearing was in response to a leading question posed by his attorney, and it argues that the claimant's average weekly wage is the best evidence in the record of the amount that he would have been able to earn in the full

performance of his occupation. An examination of the record establishes that Michel's attorney did in fact object to the claimant's introduction of a union document reflecting that laborers were paid $25.41 per hour and that the objection was sustained by the arbitrator. However, no objection was interposed when the claimant testified that he knew that laborers were making $25.41 per hour on the date of the hearing. The claimant's unrebutted testimony is the only evidence in the record establishing the rate of pay for a laborer on the date of the arbitration hearing. Thus, we find that the Commission should have calculated the amount that the claimant would have been able to earn at the time of the arbitration hearing by multiplying $25.41 times the number of hours in a full workweek. In so finding, we emphasize that the calculation of a claimant's wage differential award should be based on the amount the claimant would have been able to earn at the time of the arbitration hearing, not the amount he was actually earning at the time of his injury. See *Old Ben Coal Co.*, 198 Ill. App. 3d at 493.

A wage differential award should be calculated based on the number of hours constituting "full performance" of the claimant's particular occupation. *Forest City Erectors v. Industrial Comm'n*, 264 Ill. App. 3d 436, 440, 636 N.E.2d 969 (1994). At the arbitration hearing, the claimant testified that he was a full-time employee of Michel scheduled to work five days a week and that, as a full-time employee, his work day was 8.5 hours long. In argument before this court, however, the claimant's attorney stated that 30 minutes of each workday was devoted to lunch. Further, in his brief on appeal, the claimant asserted that "[h]e had to make himself available to work at least 40 hours per week." Consequently, we find that the full performance of the claimant's duties as a laborer in the employ of Michel consisted of a 40-hour workweek. Accordingly, the claimant's wage differential award should have been computed using $1,016.40 ($25.41 x 40 = $1,016.40) as the average weekly amount he would have been able to earn in the full performance of his duties as a laborer.

In order to calculate the amount of a wage differential award to which a claimant is entitled, a determination must also be made as to the average amount which the claimant "is earning or is able to earn in some suitable employment or business after the accident." 820 ILCS 305/8(d)(1) (West 2002). Contrary to Michel's assertion, the Commission, in its decision of December 8, 2003, correctly utilized the claimant's wage at Inlander as the amount that he was able to earn after his injury. Although the claimant earned $10.75 per hour at NTS, he testified that he had to leave that job because he experienced

pain while performing his duties, rendering the position unsuitable. After the claimant left the employ of NTS, he obtained a job at Inlander that he was physically capable of preforming and which, at the time of the arbitration hearing, paid $8 per hour, or $320 per week.

Based upon the foregoing analysis, we reverse that portion of the circuit court's order of August 12, 2004, which confirmed the Commission's wage differential award as set forth in its decision of December 8, 2003, and direct the Commission on remand to award the claimant wage differential benefits under section 8(d)(1) of the Act commencing on December 25, 1999, and continuing for the duration of his disability, calculated in accordance with our findings as to the amount that the claimant would have been able to earn in the full performance of his duties as a laborer at the time of the arbitration hearing ($1,016.40/week) and the amount that he is able to earn after his injury ($320/week), and subject to the limitations as to maximum amounts set forth in sections 8(b)(2.1) and 8(b)(4) of the Act (820 ILCS 305/8(b)(2.1), (b)(4) (West 2002)).

■ Next, we address the issues raised by the parties relating to penalties under sections 19(k) and 19(l) of the Act (820 ILCS 305/19(k), (l) (West 2002)) and attorney fees under section 16 (820 ILCS 305/16 (West 2002)). The arbitrator awarded the claimant $7,239.41 in section 19(k) penalties and $1,447.88 in attorney fees under section 16 for terminating the claimant's wage differential benefits on April 1, 2000. In her decision, the arbitrator found that Michel introduced no evidence to justify the termination. In so finding, the arbitrator relied, in part, on Dr. Brackett's report. The arbitrator never addressed the issue of penalties under section 19(l). In its original decision on April 9, 2002, the Commission, citing *Jetson Midwest Maintenance v. Industrial Comm'n*, 296 Ill. App. 3d 314, 694 N.E.2d 1037 (1998), and Industrial Commission Rule 7040.70(d) (50 Ill. Adm. Code § 7040.70(d) (2002)), held that Michel had waived consideration of the propriety of the award of section 19(k) penalties and attorney fees by failing to address the issues in its brief, although acknowledging that Michel marked the issues for consideration on its petition for review form. As a consequence, the Commission ordered Michel to pay the section 19(k) penalties and section 16 attorney fees which had been awarded to the claimant by the arbitrator. The Commission never address the issue of section 19(l) penalties. In its order of November 20, 2002, the circuit court noted that Michel had raised the issues of section 19(k) penalties and attorney fees in both its petition for review and in its timely filed amended statement of exceptions and, as a consequence, found that Michel had not waived the issues. However, instead of

remanding the matter back to the Commission to consider the issues on the merits, the circuit court addressed the issues and confirmed the Commission's award of section 19(k) penalties and attorney fees after concluding that the awards were not against the manifest weight of the evidence. The circuit court did remand the issues back to the Commission, but for recalculation only. Additionally, the circuit court found that the claimant was also entitled to section 19(l) penalties in the sum of $2,500. The Commission's December 8, 2003, decision on remand provides in relevant part as follows:

"[P]ursuant to the instruction of the Circuit Court, the Industrial Commission recalculated the amount of penalties and attorneys' fees to which the Petitioner [claimant] is entitled under sections 19(k) and 16 of the Act. Although the Commission finds Respondent's [Michel's] actions to be unreasonable and vexatious, based on the Petitioner's average weekly wage recalculated pursuant to the Circuit Court's instructions, the Commission finds that there is no penalty due. Therefore, the Commission modifies its Decision and Opinion on Review and finds that, as Respondent has over paid the amount due, Petitioner is not entitled to an award of penalties and attorneys' fees under sections 19(k) and 16 of the Act.

Also pursuant to the instructions of the Circuit Court, the Commission finds Petitioner entitled to an award of $2,500.00 in penalties pursuant to Section 19(l) of the Act."

On August 12, 2004, the circuit court confirmed the Commission's decision of December 8, 2003.

The claimant argues that the Commission erred in its determination that Michel overpaid the benefits due him and, as a result, is not liable for section 19(k) penalties or section 16 attorney fees. Michel, arguing that it was error to award any penalties or attorney fees, contends that it was against the manifest weight of the evidence for the Commission to have found that it acted in an unreasonable and vexatious manner in light of the dissent to the Commission's original decision, "the flux in the law due to *Sylvester* over the issue of average weekly wage," the arbitrator's finding that the claimant's hip bursitis was not causally related to his work injury, and the reports of Drs. Atkenson and Earman, finding that the claimant was able to return to duty as a laborer.

As the circuit court correctly found in its order of November 20, 2002, the Commission erred in finding in its original decision that Michel had waived the issues relating to the arbitrator's award of section 19(k) penalties and attorney fees under section 16. However, the determination of whether to award penalties or attorney fees is a factual question for the Commission to resolve. *McKay Plating Co. v.*

*Industrial Comm'n*, 91 Ill. 2d 198, 209, 437 N.E.2d 617 (1982). It should not be addressed in the first instance by the circuit court. Consequently, these issues should have been remanded to the Commission for resolution on the merits. Accordingly, we vacate the circuit court's order of August 12, 2004, to the extent that it confirmed the Commission's December 8, 2003, finding that the claimant is not entitled to an award of penalties and attorney fees under sections 19(k) and 16 of the Act, and direct the Commission on remand to address the issues on their merits.

■ Next, Michel argues that the claimant waived any consideration of his entitlement to section 19(l) penalties and, as a consequence, the trial court erred in finding in its November 20, 2002, order that the claimant was entitled to such an award. Our examination of the record reveals that the claimant filed a petition before the arbitrator requesting, among other relief, an award of penalties under section 19(l), the issue of "penalties" was raised in the parties' request for hearing form filed prior to arbitration, and, although not raised by the claimant in his original petition for review, he did raise the issue of his entitlement to section 19(l) penalties in his original statement of exceptions. Contrary to Michel's assertion, we find that the claimant did not waive the issue, although neither the arbitrator nor the Commission in its April 9, 2002, decision addressed it. However, as with the prior issue, the question of whether the claimant is entitled to section 19(l) penalties should have been remanded to the Commission for resolution on the merits, not decided in the first instance by the circuit court. Consequently, we vacate the circuit court's order of August 12, 2004, to the extent that it confirmed that portion of the Commission's December 8, 2003, decision awarding the claimant penalties under section 19(l), and direct the Commission on remand to address the issue on the merits.

■ Finally, the claimant contends that the Commission erred in determining that he waived consideration of the reasonableness and necessity of $3,340 in medical bills from Dr. Alvi. Michel responds that the Commission correctly determined that the claimant's failure to raise the issue of medical expenses in his petition for review resulted in its waiver. As noted earlier, the Commission, in its April 9, 2002, decision, found that the claimant had waived the issue of medical expenses by reason of his having failed to raise the issue in his petition for review, although the issue was raised in the claimant's statement of exceptions. For the reasons that follow, we agree with the claimant.

In *Jetson Midwest Maintenance*, we held that the Commission properly applied the doctrine of waiver to an issue a party failed to

raise in both its petition for review and in a timely statement of exceptions. *Jetson Midwest Maintenance*, 296 Ill. App. 3d at 316-17. Our holding was based on the well-established principle that a party's failure to present an issue before the Commission will result in its waiver. See *Thomas*, 78 Ill. 2d at 336. Here, the claimant did raise the issue of Dr. Alvi's unpaid medical bills in his statement of exceptions filed with the Commission. Therefore, the issue in this case concerns whether the claimant's failure to raise the issue in both his statement of exceptions and his petition for review resulted in its waiver. In applying the waiver doctrine in its original decision, the Commission relied upon Industrial Commission Rule 7040.70(d), which states that the Commission may only consider issues which were raised in both the review stipulation form, or its equivalent, and in the party's statement of exceptions. 50 Ill. Adm. Code § 7040.70(d) (2002). Rule 7040.70(d), however, is in conflict with section 19(b) of the Act, which provides that "[t]he jurisdiction of the Commission to review the decision of the arbitrator shall not be limited to the exceptions stated in the Petition for Review." 820 ILCS 305/19(b) (West 2002). Whenever an administrative rule conflicts with a statute, the rule will be held invalid and the statute followed. *Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs*, 89 Ill. App. 3d 292, 302, 411 N.E.2d 973 (1980). Accordingly, to the extent that Rule 7040.70(d) conflicts with section 19(b) of the Act, we find the rule to be invalid. The claimant's failure to raise the issue in his petition for review before the Commission should not have been held by the Commission to be a *per se* waiver of the issue. We find, therefore, that the circuit court erred in confirming the Commission's April 9, 2002, decision on this issue and that the Commission never addressed the merits of the issue in its December 8, 2003, decision which the circuit court confirmed. Consequently, we reverse that portion of the circuit court's order of November 20, 2002, which confirmed the Commission's December 8, 2003, finding that the claimant waived the issue of medical expenses and direct the Commission on remand to address the issues on the merits without consideration of any evidence which this court has held inadmissible.

In summary and based upon the foregoing analysis we:

1. Affirm those portions of the trial court's judgment of November 20, 2002, confirming the findings in the Commission's decision of April 9, 2002, that: the claimant suffered accidental injuries on June 15, 1998, arising out of and in the course of his employment with Michel; the claimant's condition of ill-being, including his right hip bursitis, is causally connected to his work injury; the claimant is entitled to TTD benefits for the periods

from June 16, 1998, until October 23, 1998, and December 14, 1998, until November 4, 1999; and the claimant is entitled to wage differential benefits under section 8(d)(1) of the Act commencing on December 25, 1999, and continuing for the duration of the claimant's disability;

2. Affirm those portions of the trial court's judgment of November 20, 2002, finding that: the calculations in the Commission's decision of April 9, 2002, fixing the claimant's average weekly wage at $899.04 was against the manifest weight of the evidence; the Commission erred in its decision of April 9, 2002, in concluding that Michel waived the issues relating to the section 19(k) penalties and section 16 attorney fees; and the claimant's hourly salary at Inlander should be used to determine the wage differential benefits to which he is entitled;

3. Affirm that portion of the trial court's order of March 21, 2003, finding that the claimant waived the issue of his entitlement to maintenance benefits for the period from November 30, 1999, through December 25, 1999;

4. Affirm that portion of the trial court's judgment of August 12, 2004, confirming the finding in the Commission's decision of December 8, 2003, that the claimant is entitled to TTD benefits for the periods from June 16, 1998, until October 23, 1998, and December 14, 1998, until November 4, 1999;

5. Reverse those portions of the trial court's judgment of November 20, 2002, confirming the Commission's April 9, 2002, affirmance of the arbitrator's admission into evidence of the reports and records of Drs. Brackett, Alvi, and Lorenz and the LaGrange exhibit;

6. Reverse those portions of the trial court's judgment of November 20, 2002, finding that: the claimant is not entitled to maintenance benefits from November 5, 1999, until November 29, 1999; the claimant's average weekly wage should be used to determine the wage differential benefits to which he is entitled; and the claimant waived the issue of medical expenses;

7. Reverse that portion of the trial court's order of March 21, 2003, finding that the claimant is not entitled to maintenance benefits for any period subsequent to November 4, 1999;

8. Reverse those portions of the trial court's judgment of August 12, 2004, confirming the calculations in the Commission's decision of December 8, 2003, fixing the claimant's: average weekly wage at $570.70; wage differential award at $167.13 per week; and TTD benefits at $380.47 per week;

9. Reverse those portions of the trial court's judgment of August 12, 2004, confirming the findings in the Commission's decision of December 8, 2003, that: the claimant is not entitled to maintenance

benefits for any period subsequent to November 4, 1999; and the claimant's wage differential benefits commence on November 5, 1999;

10. Reinstate that portion of the Commission's decision of April 9, 2002, finding that: the claimant is entitled to maintenance benefits from November 5, 1999, until November 29, 1999; and the claimant is entitled to wage differential benefits under section 8(d)(1) of the Act commencing on December 25, 1999, and continuing for the duration of the claimant's disability;

11. Vacate those portions of the trial court's judgment of November 20, 2002, finding that: the Commission's affirmance of the arbitrator's award of section 19(k) penalties and section 16 attorney fees is not against the manifest weight of the evidence; and the claimant is entitled to section 19(l) penalties;

12. Vacate those portions of the trial court's judgment of August 12, 2004, confirming the Commission's December 8, 2003, finding that: the claimant is not entitled to an award of section 19(k) penalties or section 16 attorney fees; and awarding of $2,500 in section 19(l) penalties; and

13. Remand this matter to the Commission with instructions to: fix the claimant's average weekly wage at $800.95; recalculate the claimant's TTD benefits, maintenance benefits, and wage differential benefits in accordance with the opinions expressed in this order; address, on the merits and without consideration of any evidence which this court has found to have been inadmissible, the issues of the claimant's entitlement to section 19(k) penalties and section 16 attorney fees and, if it is determined that the claimant is entitled to such awards, to recalculate the sums due based only on outstanding amounts due the claimant on the date of the arbitration award after giving Michel credit for the sums paid to the claimant; address, on the merits and without consideration of any evidence which this court has found to have been inadmissible, the issues of medical expenses; and recalculate the amount of section 19(l) penalties, if any, that the claimant is entitled to as a result of Michel's failure, neglect, refusal or unreasonable delay in the payment of weekly compensation benefits due the claimant during the period of TTD only.

Affirmed in part; reversed in part; vacated in part and remanded to the Commission with instructions.

McCULLOUGH, P.J., and CALLUM, HOLDRIDGE, and DONO-VAN, JJ., concur.